Commonwealth ex rel. Levine, Appellant, v. Fair.

Argued September 30, 1958. Before JONES, C. J., BELL, MUSMANNO, JONES and COHEN, JJ.

reargument refused January 8, 1959.

*Frank O. Moretti,* with him *Orville Brown,* and *Sherman K. Levine,* for appellant.

*W. Walter Braham,* for appellee.

OPINION BY MR. JUSTICE MUSMANNO, December 13, 1958:

In the fall of 1957, an election campaign of almost pyrotechnical intensity crackled and raged in Lawrence County for the office of district attorney. Fiery speeches, inflammatory handbills, radio denunciations kept the political atmosphere at a broiling degree of temperature until the very eve of the election. The incumbent district attorney Perry L. Reeher, who was a candidate for re-election on the Republican ticket, had been indicted for an alleged conspiracy growing out of the primary election, and had been superseded by the Attorney General of the Commonwealth. A former judge of the court of common pleas, W. Walter Braham, entered the battle in behalf of Reeher and levelled considerable fire against Sherman K. Levine, a former district attorney who was supporting Joseph Solomon, the Democratic candidate for district attorney. Mr. Levine unlimbered his oratorical guns on Braham. Reeher blasted at Levine.

Then, on October 30, 1958, there suddenly emerged from the smoke of the campaign battle constable Andrew L. Fair armed with a warrant of arrest for Sherman Levine. The warrant was based on an information signed by Mrs. Ethel Rugh, whose attorney was W.

Walter Braham who was manning the guns for Reeher on the political ramparts, as above observed. The information charged Levine with forgery and the uttering of a forged instrument, all supposed to have happened in July, 1955, twenty-seven months before. The constable found Mr. Levine at his law office and took him into custody. Mr. Levine saw in the seizure a stratagem to cripple his efforts and influence in the election, now only six days away. He immediately petitioned the Court of Common Pleas of Lawrence County for a writ of habeas corpus, protesting that the arrest was a "political plot" and asking for a hearing forthwith. Judge JOHN S. POWERS ordered the issuance of the prayed-for writ and constable Fair delivered Levine into court. The judge set November 1st for a hearing at which time Levine appeared with his two attorneys, Orville Brown and Frank O. Moretti. Mr. Braham appeared technically for constable Fair but in reality he was representing Mrs. Rugh in her capacity as private prosecutrix against Mr. Levine. He had constable Fair testify to Levine's arrest on a warrant duly issued by Alderman James C. Brice of New Castle, he then introduced the warrant of arrest and information, and rested his case.

Mr. Moretti now asked permission to substantiate the allegations in Mr. Levine's petition, but Mr. Braham objected, asserting that the only question before the court was whether Levine had been lawfully taken into custody. The court ruled that since the relator Levine had charged that his arrest was not a legitimate prosecution but a "political plot," it was incumbent on the Commonwealth to produce the evidence which could be submitted to the grand jury on probable cause. Mr. Braham replied that if the court compelled him to proceed against Levine he would ask for a continuance, since he was not presently prepared to

go forward with the prosecution. The court granted the continuance and set the following Monday, November 4th, for the hearing.

On that day the Commonwealth was represented by Frank Lawley, deputy attorney general, who had come from Harrisburg on the telegraphic request of Mr. Braham. Mr. Braham and Mr. Lawley went into a conference on facts and procedure and, at the termination of the conference, the court called upon the Commonwealth to establish its prima facie case of crime against Levine, thus refuting the charge that he had been arrested not because of a crime committed but in order to hamper and impede him in the political campaign in which he and Braham, as backers of their respective candidates, were now, in dramatic clash, momentarily eclipsing the main contenders.

Mr. Braham refused to produce evidence and asserted that the hearing was "unlawful." Deputy attorney general Lawley, however, accepted it as lawful and declared his willingness to present the Commonwealth's case, based on evidence presumed to be in possession of the private prosecutrix. Mr. Braham demurred to Mr. Lawley's assertion and wanted to know if Mr. Lawley was taking the position that he was "going to force this up at this time." Mr. Lawley, speaking for the Commonwealth, replied: "The court has ruled, Mr. Braham, that the habeas corpus is proper, regardless of what your personal views or my personal views may be on the subject, the court has said that there shall be a habeas corpus hearing. Now on behalf of the Commonwealth, if there are Commonwealth witnesses here to prove the charge that this is a forgery, then let's prove it. If there are not, then the habeas corpus would have to be granted, it's as simple as that."

Mr. Braham expressed his determination not to proceed and the court, in the face of this recalcitrance, discharged the relator. The respondent then appealed to the Superior Court which reversed the action of the Court of Common Pleas of Lawrence County. The relator petitioned this Court for an allocatur, which was granted.

At the hearing before Judge POWERS, it was contended by the nominal respondent, constable Fair, through the attorney for the private prosecutrix, that the court had no jurisdiction under the Act of July 1, 1937, P. L. 2664, to conduct a hearing since there had been no denial of due process in the arrest of Sherman Levine. Section 1 of that Act provides: "In all cases where writs of habeas corpus are granted, the judge granting the writ may inquire and examine into the facts of the case." Standing alone, it would be quite clear that, once the writ issues, the judge granting it is authorized to "inquire and examine into the facts" which necessitated the issuance of the writ. Even without the Act of 1937, a judge would have the right to inquire into the facts which caused the detention of the petitioner. Without that authority the writ of habeas corpus would be meaningless. Of what use would it be to a person deprived of his liberty if he were brought before a judge who had no authority to ascertain whether he was properly detained or not? The question thus is not whether the judge has or has not the right to inquire into the facts of the case, but whether, once it has been ascertained that the prisoner was taken into custody by due process of law, the judge may proceed further to determine if there was abuse of process.

Section 2 of the Act of 1937 provides: "Such examination into the facts of the case shall include an examination by the judge into all the proceedings held and

evidence produced before a judge, magistrate, justice of the peace, or other officer sitting as a committing judge or magistrate, and if such proceedings shall, after inquiry, be deemed to have been conducted not in accordance with law, or the evidence deemed insufficient, the prisoner shall be discharged."

Here it is obvious that even though a defendant may have been arrested on a warrant properly issued and based on an information duly sworn to and filed, the judge may still inquire as to whether the evidence was sufficient to make out a prima facie case. Since Alderman Brice, who authorized the warrant of arrest, had not conducted a hearing before the writ issued from the Court of Common Pleas of Lawrence County, the attorney for the prosecutrix maintained that Judge POWERS of the court of common pleas had no authority to demand the presentation of evidence in order to determine its sufficiency for submission to a grand jury.

He contended further before Judge POWERS, as indeed he argued before us, that if a judge may hear evidence after arrest and before a preliminary hearing by a magistrate, every arrested person will demand such a hearing. Such a practice, he said, would place an "intolerable burden" on the courts. He illustrated this contention by citing that in Lawrence County there are approximately 200 cases of arrest every term. This illustration is not convincing. If a procedure is authorized and justified under the law, it is no argument to say that such a procedure would place a burden on the courts. The courts are open to do justice under the law, regardless of burden, and every aggrieved person has the right to be heard, especially if he claims he is being illegally deprived of his freedom. Justice is not limited by the size of the courtroom and freedom is not measured by the strength of a judge's back.

The appellee's argument is additionally weak because it is by no means certain that every person arrested under process issuing from a justice of the peace would seek a hearing before a judge. Most defendants would have many reasons for preferring to let matters take their regular course before the minor judiciary.

This whole line of argumentation, however, is at best academic, because the question before us on this appeal is not whether *anybody* may knock at the door of a judge of the court of common pleas after being arrested, but whether, under the particular circumstances existing in *this* case, Sherman K. Levine had the right to apply for a judicial hearing.

If, as Mr. Levine charged, he was being made the victim of a "political plot"; if, in reality, a mischief of some kind was afoot to thwart an honest and impartial election, where else could Mr. Levine go but into a court, to seek protection and redress? The private prosecutrix urges upon us that Mr. Levine should have waited until the alderman accorded him a hearing, but if the alderman delayed until after the election (and there was not the slightest weather sign that anyone of the prosecution desired the hearing to take place prior to election day; in fact all signals pointed to an inevitable conclusion that the magistrate's hearing would cool its heels until after election); thus, if the hearing was not to take place until the election was history, and there did in fact exist some devious political plotting as charged by Mr. Levine, the harm against which he protested would be accomplished prior to the hearing and before any possible exoneration.

To have a judicial proceeding after immutable events have irrevocably resolved the issue in dispute is like conducting a diagnosis after the patient has died. A posthumous vindication makes excellent reading as

an epitaph, but it offers little comfort to the victim who has turned to dust.

The rights of the prosecutrix Mrs. Rugh would in no way have been impaired if she and her witnesses had testified when requested to do so by Judge POWERS. On the contrary, she would have benefited by an acceleration of the criminal processes which she had waited twenty-seven months to initiate. After slumbering for over two years on her rights, she should have welcomed the alarm clock which awakened her to the need for immediate action if her claim was not to die through sheer neglect. Instead—after she was provided with a forum in which to prosecute the man she claimed had wrongfully taken money from her—she preferred to sleep a little longer.

The alleged crime she charged against Mr. Levine arose out of the following fact-situation. Helen McCandless and Fred Rugh, husband of the prosecutrix, were partners in a trucking business in New Castle. On July 28, 1955, Fred Rugh died and Helen McCandless, the surviving partner, wrote out a check for $2846.61, signing the firm name of Fred Rugh. Sherman K. Levine, who was attorney for Mrs. McCandless, endorsed the check as trustee of the McCandless-Rugh partnership, and the check was deposited in the Peoples Bank in New Castle. It appears from the history of the transaction, as related in the appellant's brief, and not refuted by the appellee, that Mrs. Ethel Rugh, as administratrix of the estate of Fred Rugh, instituted several lawsuits in the Court of Common Pleas of Lawrence County on the subject of the McCandless-Rugh partnership assets. As a result of the lawsuits, W. Walter Braham, then Judge of the Court of Common Pleas of Lawrence County, signed an order on November 26, 1955, authorizing depositions in the pending litigation. In the process of the taking of such

depositions Mrs. McCandless testified under oath that she had signed the $2846.61 check because she claimed this amount as surviving partner. However, she did not cash the check. On the contrary, it was deposited in the Peoples Bank with the specific declaration that the money was not to be paid to anyone without a court order. A suitable notation was made in the records of the bank.

During this period Mrs. Rugh was represented by an attorney Lyon, but in April, 1957, Mrs. Rugh changed attorneys and Mr. Braham began to represent her. He filed two additional civil lawsuits in her behalf, in one of which he named Mr. Levine as defendant. On June 21, 1957, Mr. Levine wrote Mr. Braham offering an amicable settlement of the financial controversy between his client, Mrs. McCandless, and Mr. Braham's client, Mrs. Rugh. In this letter he stated that if no amicable settlement was reached and the court held that there had been no partnership or joint venture between Mr. Rugh and Mrs. McCandless the funds in the bank would be turned over to such person as the court designated. So far as the record shows, Mr. Levine at no time received any part of the sum of $2846.61. Nor, in fact, has anyone else, the fund still remaining intact in the bank and subject to disbursement only on order of the court.

Shortly after District Attorney Reeher was superseded by the Attorney General of Pennsylvania, Reeher applied to this Court for a writ of prohibition against the Attorney General to prohibit him from taking up the functions and duties of the district attorney of Lawrence County. In his petition, Mr. Reeher alleged that Mr. Levine had without legal warrant participated in proceedings before the grand jury. Mr. Levine filed an answer denying the charge. Mr. Braham entered his appearance for Reeher in these proceedings. The Supreme Court denied the writ.

Then, as stated, on October 30, 1957, constable Fair arrived on the scene beating the drums of war. Mr. Levine's attorney, F. O. Moretti, saw no reason for a conflict in the court proceedings and stated he would make admissions which should satisfy the prosecutrix that her supposed alarm over any danger to the embattled $2846.61 was unwarranted. This prompted Mr. Braham to ask Mr. Moretti: "Are you prepared to make a judicial admission that Mrs. McCandless signed the name of the dead man to this paper, and are you prepared by way of judicial admission to admit that Sherman K. Levine took this check on which she had signed the name of the dead man and endorsed it?" Mr. Moretti replied: "I will not only admit that, your Honor, and make it a judicial admission but Mr. Braham himself knows that Mrs. McCandless testified to that under oath."

Mr. Braham asked further if Mr. Moretti had authority to speak for Mrs. McCandless and Moretti replied that he did have such authority.

Then the following occurred: "Mr. Moretti: I say to you, Mr. Braham, that Mrs. McCandless had signed the check on that particular morning, she is in court to so testify any time you so desire and that fact has been known to Mrs. Rugh and everyone who has represented her and has been known—Mr. Braham: But you say, 'had signed it', do you contend that she signed it before the death? Mr. Moretti: Mr. Braham; let's not quibble over words. Mr. Braham: This isn't a quibble. Mr. Moretti: Mr. Braham, let's not quibble over words. Mrs. McCandless is in court now ready to testify that she signed the check. Now what more do you want? Mr. Braham: Do you admit that McCandless signed the name of this dead man? Mr. Moretti: Mr. Braham, what do you want me to do, get down on my knees and tell you that Mrs. McCandless is in court to testify that she signed that check on that morning."

Mr. Braham made no observation on this offer but contented himself with remarking: "This case ought to take the course of every criminal proceeding."

The Court observed: "In view of the admission by Mr. Moretti I don't see any reason for any unreasonable delay."

Mr. Braham complained that the Court was asking him to do an "unreasonable thing" "the day before election." The Court then continued the case until the following Monday, November 4, 1957. Mr. Braham complained that Monday was "too soon."

The election was set for the next day, November 5th. If, in fact, as Mr. Levine swore to under oath, there was a "political plot" against him, when was the hearing to take place—after the election?

The record reveals with diaphanous clarity that the prosecutrix through her attorney, had no desire to proceed with the prosecution prior to election day.

As Judge POWERS later summarized the situation: "Since the circumstances surrounding the arrest of relator strongly suggested an inspirational political motive, we conceived it to be our duty to examine the facts of the case and thereby satisfy ourselves that a fraud was not in fact being perpetrated upon the criminal procedure of the Commonwealth."

Although Mr. Levine had made a very serious accusation against those who had launched the prosecution, although the prosecutrix was in court, although witnesses were ready and willing to testify, although by proceeding with evidence of a prima facie case of crime against Mr. Levine, the prosecutrix and her attorney could dispel the assumption that "the circumstances surrounding the arrest of relator strongly suggested an inspirational political motive," the prosecutrix stood on the sidelines and jeered at the procedure she herself had set in motion; she attempted to wreck

the very vehicle she had taken out of the garage of twenty-seven months' contemplation.

But the courtroom is not intended to be used as an arena of inconsequential pastime, political manipulation, or whimsical entertainment.

The prosecutrix threw a blanket of suspicion and stigma over the name of the defendant who, being an attorney, was, ex officio, an officer of the court, and then objected to the Court's lifting the blanket to determine whether the stigmatization was justified by the facts.

If such a practice were to be countenanced it would mean that in an election campaign, any candidate's name could be thrown into shadow with an arrest, and then, further action could be suspended until after the election when a vindication could be of no use to the accused, in the event he was defeated because of the unproved charges.

The Superior Court in reversing the action of the Lawrence County court, said: "Relator's application for a writ of habeas corpus was premature and has resulted in the unwarranted delay which he apparently sought to avoid." The chronicle of events shows just the contrary. Mr. Levine's application for a writ of habeas corpus achieved precisely what he desired, that is, an immediate hearing. No one knows whether the discharge of Mr. Levine affected the election or not but it achieved the result of clearing his name before the writing of the decision at the polls and demonstrated that the courts are ready to act with dispatch when a citizen, whose liberties are threatened and his reputation jeopardized, comes into court and offers to submit himself to the court's jurisdiction on whatever evidence his accusers wish to present.

As already stated, a span of twenty-seven months separated the alleged crime and the arrest which oc-

curred only six days before a crucial election in which the accused, although not a candidate, apparently had much at stake in the way of prestige in the community. Mr. Braham became counsel for Mrs. Rugh in April, 1957. Explaining why he waited until October 30, 1957, to have Mr. Levine arrested and charged with crime, he said that he had turned the matter over to the district attorney in May, 1957. The district attorney was not superseded until September, 1957. Why did he not act during that four-month period? Why did Mr. Braham not request him to act? Moreover, although the district attorney was superseded in September, 1957, the machinery of his office was not paralyzed. And then, when the Attorney General took over the functions and duties of the district attorney, why was he not called upon to proceed against Mr. Levine? And then, again, the most unanswerable question of all, consistent with a sincere intention to prosecute Mr. Levine on the basis of a committed crime, why did the prosecutrix and her attorney turn their backs on the deputy attorney general who urged them to come forward with their evidence against Levine?

And it is significant to observe here that although Mrs. McCandless was also arrested on October 30, 1957, no attempt was made, or, as indicated at the oral hearing, has since been made, to proceed against her before an alderman.

It is true, as stated by appellee's counsel and as emphasized by the Superior Court, that the usual criminal procedure, after an arrest has been effected, is for the court not to interfere until the arresting magistrate has conducted a preliminary hearing to determine if a prima facie case has been produced against the defendant. This is indeed the normal practice as it is the normal routine for one to leave his home through the door, but it can happen, as in the case of fire, when

the householder may find it wiser and more expedient to depart via the window.

We do not intend in this opinion to endorse any generalized application, through habeas corpus or otherwise, to a court to stay warrants of arrest when issued. It is where an unusual situation presents itself, and the one under discussion indeed falls within that category, that the judge is not only authorized but it is a function of his office to break the outer shell of formula to get at the kernel of the trouble, especially where abuse of criminal process is averred.

It would be a sad commentary on the state of the law if, for instance, on the eve of a Senate vote on a cabinet appointment, the appointee should be arrested under a false accusation in order to blacken his name and he would have no way to expedite a hearing to clear his name. Or let us suppose that a person is about to sail abroad and he is arrested a day or two before the sailing, and there is every indication that the prosecutor purposely delays a hearing so that the passenger may miss his sailing. If in such a case the arrested person applied to the court, alleging a criminal plot, no judge would tell the petitioner that his only relief was to wait until the justice of the peace acted. He would proceed at once to a hearing to determine whether a criminal plot did or did not exist. *Aequum et bonum est lex legum.*

In *Price v. Johnston,* 334 U. S. 266, the Supreme Court of the United States said: "The historic and great usage of the writ, [habeas corpus] regardless of its particular form, is to produce the body of a person before a court *for whatever purpose might be essential to the proper disposition of a cause.* The most important result of such usage has been to afford *a swift and imperative remedy* in all cases of illegal restraint upon personal liberty." (Emphasis supplied)

When a person is in the custody of a constable he is being restrained of his liberty and if the restraint is due to a malicious and illegal prosecution initiated for a malicious and illegal purpose, there can be no question that habeas corpus lies to determine his rights in the matter. The Supreme Court of the United States said further in the case of *Price v. Johnston*, that "The principle has developed that the writ of habeas corpus should be left sufficiently elastic so that a court may, in the exercise of its proper jurisdiction, *deal effectively with any and all forms of illegal restraint*." (Emphasis supplied)

The case at bar is classic for a demonstration of the power of a court of the Commonwealth of Pennsylvania, in order to see that justice is done, to inquire into the reason for a restraint. In the case of *Commonwealth v. Shortall*, 206 Pa. 165, 178, this Court discharged a defendant on a writ of habeas corpus even though there had been no preliminary hearing before a justice of the peace. The defendant, Arthur Wadsworth, a national guardsman, had been arrested and charged with manslaughter as the result of a killing which occurred during turbulence in a strike area. This Court was convinced that the facts did not make out a prima facie case and, in discharging the relator, said: "This court, either sitting as a committing magistrate or by virtue of its supervisory jurisdiction over the proceedings of all subordinate tribunals (Gosline v. Place, 32 Pa. 520) has the authority and the duty on habeas corpus in favor of a prisoner held on criminal charge, to see that at least a prima facie case of guilt is supported by the evidence against him."

In *Halderman's Petition*, 276 Pa. 1, 2, we cited the *Shortall* case with approval and stated that while the writ has limitations it does apply in ". . . unusual cases, where the proceeding has been adopted in furtherance of the prompt administration of justice. . . ."

In *Commonwealth ex rel. McGlinn v. Smith,* 344 Pa. 41, 48, we said that the remedy of habeas corpus is an extraordinary one which may be invoked "in exceptional cases where there is a *'peculiar and pressing need for it.'* " (Emphasis supplied)

There was indeed a "peculiar and pressing need" for the writ in the instant case. The controversy between the defendant and counsel for the private prosecutrix was inextricably intertwined with the election campaign and when the defendant was arrested less than a week before the citizens of the county were to wend their way to the polls, and the defendant charged the arrest was an illegal attempt to influence the voters through a meretricious use of the courts, the "peculiar and pressing need" for habeas corpus became imperative and demanding.

As already indicated, the prosecutrix argued through her attorney that the relator was not entitled to release on habeas corpus since the Act of 1937 did not apply to his fact-situation. But the Act of 1937 did not displace the common law writ of habeas corpus *ad subjiciendum.* (11 Standard Pennsylvania Practice Act, 94.) The common law writ is even more extensive in its scope than that authorized by the Habeas Corpus Act of February 17, 1785, 2 Sm. L. 275, sec. 13). In the case of *Williamson v. Lewis,* 39 Pa. 9, 29, this Court said: "It [common law habeas corpus ad subjiciendum] has a much broader scope than that form of it which is secured by the Habeas Corpus Act; for it may issue in all sorts of cases where it is shown to the court that there is probable cause for believing that a person is restrained of his liberty unlawfully or against the due course of law."

The Superior Court seemed to equate a hearing before an alderman with a habeas corpus proceeding before a court of common pleas. They are as dissimilar

as night and day. The preliminary hearing conducted by a magistrate has to do with the presentation of a prima facie case against the defendant. The hearing on habeas corpus constitutes an inquiry into the legality of the restraint imposed on the defendant. The jurisdiction of a court of common pleas is naturally superior to that of a justice of peace, and "when this official superiority exists, they may go back of the warrant, and ought to do so in proper cases." (*Williamson v. Lewis*, supra, p. 30)

It is obvious that the relator Levine was aware of the limitations of the Act of 1937 and accordingly did not rely on it in his petition for the writ. For convenience and clarification the petition is quoted here in its entirety: "The Petition of Sherman K. Levine respectively represents: 1. That a warrant has been issued charging your petitioner with forgery and writing forged instruments and that he is in custody of A. L. Fair, a constable. 2. That your petitioner is not guilty of any crime and that the said Ethel Rugh, the prosecutrix is represented by W. Walter Braham, the attorney for Perry L. Reeher. 3. That such arrest is a political plot to aid the election of Perry L. Reeher and has no foundation and is known by both Perry L. Reeher and W. Walter Braham to be without any foundation whatsoever. WHEREFORE, your petitioner prays that a writ of habeas corpus be issued commanding that A. L. Fair bring Sherman K. Levine before the court immediately for a hearing."

In *Gosline v. Place*, 32 Pa. 520, this Court said: "If a habeas corpus at common law issues, and the return to it shows, that the prisoner is held by virtue of proceedings in a court, or before a magistrate over which the court issuing the habeas corpus has a supervisory authority, the said court may issue a certiorari to bring up the record; and may thereupon hear and de-

cide the case, or review and correct the proceedings, in order to give efficiency to the writ of habeas corpus."

As important as is the Act of 1937 it is not the only avenue of escape from an unjust prosecution. The date of that Act reveals its recency, and, since the right to relief under habeas corpus is an ancient one, it is obvious that there were other means prior to 1937 of saving a person sinking in the quicksands of unlawful restraint.

From time immemorial man has always looked with marked aversion on any curtailment of his natural rights. When he beheld any situation which offended his most primative evaluation of justice, when it was clear that the commonest understanding perceived something wrong, when senses and spirit recoiled in the presence of what contradicted the most rudimentary ideas of fair conduct between human beings, he demanded that society use its collective force to restore natural balance. Long before the Pennsylvania Legislature enacted the law of 1937, long before the dawn rose on the Constitution of the United States, and long before Magna Charta clipped the claws of monarchical absolutism, the dignity of man proclaimed inalienable rights through law, and one of the most sacred of man's inherent possessions took form in the right to be informed of any offense which abridged his freedom.

When Paul of Tarsus, who was being menaced by the mob, was brought for judgment before the Roman Governor Festus in Caesaria he said: "For if I be an offender, or have committed anything worthy of death, I refuse not to die: but if there be none of these things whereof these accuse me, no man may deliver me unto them." (Acts, 25, xi) The Governor agreed: "It is not the manner of the Romans to deliver any man to die, before that he which is accused have the accusers face

to face, and have license to answer for himself concerning the crime laid against him." (Ibid. xvi)

The Governor called for evidence but no accusers appeared to present charges recognized in law. The mob, however, clamored that Paul "ought not to live any longer;" and Paul asked for leave to appeal to Emperor Augustus.

The Governor acknowledged the right of appeal and asked King Agrippa to hear Paul's case so that, in the examination, the Governor might ascertain and record what, if any, were the offenses committed by Paul. And at this point in history the Roman Governor announced the immortal principle which is the very pulsating heart of justice: "For it seemeth to me unreasonable to send a prisoner and not withal to signify the crimes laid against him." (Ibid. xxvii).

Here, then, in the Roman province of Caesaria, were planted the seeds of the plant which itself produced seeds which were carried to all parts of the world until now no English-speaking nation contains land so sterile that it does not provide soil to nurture habeas corpus, the most protective of all trees in the entire sylvan empire of civilization. And thus, every applicant for the writ of habeas corpus seeks what Paul sought in Caesaria, a signifying of the crimes laid against him.

When Sherman Levine filed his petition in the Court of Common Pleas of Lawrence County he only asked for a hearing. He desired to know what he was to answer to. The information filed in the office of Alderman Price may have been complete on its face but since the relator charged that it was founded in fraud, the court had the responsibility, which it courageously met and ably discharged, of calling upon both parties to present their respective positions. The relator responded to the court's invitation, the prosecu-

trix refused to speak. She said she would present her case in another tribunal. This was no answer to the charge of deception and deceit advanced by the relator. This was no answer to the grave accusation that the judicial processes of the Commonwealth were being perverted. This was no answer to the serious situation calling for immediate resolution. A court of the Commonwealth was in session to inquire into the urgencies of the case. A court was ready to determine if the machinery of justice was being employed to perform an election trick. A judge was ready to receive and consider whatever the prosecutrix had to present. For the judge to have done nothing would have made a mockery of judicial procedure. The washing of hands has come down the centuries as a symbol of weakness in the face of lawlessness and indecision in the presence of coercion.

In his excellent treatise on Habeas Corpus, Rollin C. Hurd said in 1876: "On all questions of law arising in the course of the investigation the prisoner is entitled to the benefit of the judge's decision, and although he may regret the necessity of encountering an unsettled principle without the assistance of his brethren, yet, being legally competent, he is bound to meet all questions of law; for he trifles with the rights of the prisoner and the liberties of the citizen, as secured by the habeas corpus act, when, from timidity, he delegates his functions to another tribunal, and refuses to decide on the only ground on which the prisoner rests his claim to be discharged."*

The appellee argues that Judge POWERS was not sitting as a committing magistrate and therefore could not pass on the prima facie evidence of the prosecu-

* A Treatise on the Right of Personal Liberty, and on the Writ of Habeas Corpus by Rollin C. Hurd, 1876; p. 276.

trix' case. It did not matter whether or not the judge formally announced how he was sitting. It was clear that under the powers of his office he had plenary powers to proceed. He well explained his action by saying: "Since the complete record was before us, we had full power, under this common law authority over inferior magistrates, and also by virtue of being a justice of the peace, to require the Commonwealth to produce evidence proving a prima facie case against the relator even though the hearing before this preceded a preliminary hearing."

In the case of *Gosline v. Place*, 32 Pa. 520, 524, this Court, speaking through Chief Justice LOWRIE, said: "The Court of Common Pleas, as a court, has the same authority at common law over its inferior magistrates, by means of the writs of habeas corpus and certiorari; and to this is added the express authority given by the constitution (art. 5th, section 8) to exercise the same authority over justices of the peace, by means of the writ of certiorari, that the Supreme Court has over all inferior jurisdictions; and it may, of course, use these writs as ancillary to each other."

Under Article V, section 9, of the Constitution of 1874, judges of the courts of common pleas "shall be Justices of the Peace as to criminal matters."

In *Cochran v. Eldridge*, 49 Pa. 365, the scholarly Chief Justice WOODWARD wrote: "That wholesome maxim of the common law, that fraud vitiates whatever it touches, makes no exception of judgments at law. No court of justice will set aside or even be led to look into a solemn judgment on light or trivial grounds, but when it is alleged upon adequate proofs that a judgment in whole or in part has been obtained by a suppression of truth which it was the duty of the party to disclose or by the suggestion of a falsehood or by any of the infinite and therefore undefinable

means by which fraud may be practised, no court will allow itself, its records, and the process of law to be used as instruments of fraud."

And if a court may strike down a completed fraud, certainly it may act to prevent the commission of a fraud when proper application is made, and proper evidence is submitted to support it.

The Superior Court, in its opinion reversing the action of the Court of Common Pleas of Lawrence County, proceeded on the erroneous basis, as did the prosecutrix, that if Levine was entitled to relief he could have it only under the Act of 1937. But relief from illegal restraint is not limited to cases falling within the scope of the criminal code. In the vast American temple which shelters those whose liberties have been restrained, the judges are prepared to hear every type of cause which restricts the freedom of a citizen to go where and when he pleases within the law. The causes include but are not limited to controversies involving the custody of children, the legality of exclusion or deportation of aliens, the jurisdiction of draft and exemption boards, the detention of persons arrested in civil actions, the enlistment of minors in military service, the question of excessive bail, the contempt of legislative bodies, patients in hospitals, guardians over incompetent persons, the legality and detention of alien enemies, drunkards, persons restrained by ne exeat, paupers, seamen, slaves, peons, and others.

There is no locked door which may not be opened by the key of habeas corpus, there is no stone wall which may not be pierced by it, there is no enclosure which may not be entered by the person bearing this writ, which is now accepted as the greatest and most important remedy known to jurisprudence and which Blackstone called "the most celebrated writ in the English law." (3 Blackstone Comm. p. 129).

Nor does one need to search through the books for a precedent for its application. Although the complexities of modern life are constantly expanding, and are now even traveling into spheres of conduct and human relationship reaching into the very spaces of the infinite, the principle of the right to untrammeled freedom of action is still the fixed star in the sky of the English-speaking world. Hence, no matter what may be the situation or how involved the circumstances, any person who claims he is illegally imprisoned or restrained of his liberty may have such claim inquired into by a competent court, and, if his claim is found to be well grounded, he will be discharged and freed of such restraint.

The writ of habeas corpus in Pennsylvania may be molded to suit the exigencies of any particular case. "It is an implied common-law power, not created by the habeas corpus act of February 18, 1785, 2 Sm. L. 275, sec. 13, but existing both before and since the passage of that act, in every court of record, invested with extensive appellate or supervisory jurisdiction; and, in a proper case, it is always grantable, whether applied for in term time or in vacation." (*Commonwealth v. Gibbons*, 9 Pa. Superior Ct. 527, 533.)

In the case of *Commonwealth v. Fox*, 7 Pa. 336, the relator, whose minor son had been enlisted in the United States Army without his father's approval, applied for a writ of habeas corpus, alleging illegal restraint of the boy. This Court issued the writ and discharged the son, Justice COULTER stating in cogent language: "Our statute of 18th February, 1785, sec. 13, provides that the writ shall issue in all cases when any person, not committed or detained for any criminal or supposed criminal matter, shall be confined or restrained of his liberty, *under any colour or pretence whatsoever* . . . This is in accordance with the principles of

the common law, by the provisions of which the writ of *habeas corpus ad subjiciendum* is the prerogative of the citizen; the safeguard of his person, and the security of liberty—*no matter where or how the chains of his captivity were forged—the power of the judiciary in this state is adequate to crumble them to dust, if an individual is deprived of his liberty contrary to the law of the land.*" (Emphasis supplied)

To arrest a person and then refuse to present evidence against him so that he may reply to it is to wrap him in chains which may restrict his liberty even more than prison bars. Bail may release him from prison but no bail can break the shackles of suspicion and mistrust which he must drag with him until he has an opportunity to meet his accusers and reply to their charges.

Mrs. Rugh called upon the processes of the law to have Mr. Levine taken into criminal custody and then, having effected this restraint, she declined to put into operation the only procedure which an arrest is intended to accomplish, namely, the presentation of evidence against the accused. Her determination not to proceed was constant and unyielding. This obstinancy might well have been interpreted by the Court as either an abandonment of the criminal charges or as a demonstration of contumacy.

In any event, in the face of this impasse, any further restraint on the relator's freedom of movement would have constituted illegal imprisonment. Under all the circumstances, then, for the Court to have taken any course other than the one it pursued would have meant an abdication of authority, an indifference to duty, and a jettisoning of respect for law and orderly procedure.

The order of the Superior Court is reversed and the relator is discharged.

CONCURRING OPINION BY MR. JUSTICE BELL:

Because of the very exceptional circumstances of this case, which we all agree is *sui generis,* I concur in sustaining the writ of habeas corpus.

Mr. Justice BENJAMIN R. JONES joins in this concurring opinion.

DISSENTING OPINION BY MR. CHIEF JUSTICE JONES:

I would affirm the order of the Superior Court.

Whether a writ of *habeas corpus* can be availed of, in certain extraordinary circumstances, to nullify or set aside (prior to a preliminary hearing) the arrest of an accused made pursuant to a valid warrant issued upon a sufficient information before a justice of the peace, alderman or magistrate, seems to me presently unnecessary to consider or decide. I therefore purposely refrain from expressing any opinion in such regard. Nor, by dissenting, am I to be considered as condoning either the motives or the conduct of those responsible for the institution of the assailed prosecution. The facts are fully and fairly set forth in the opinion for the court.

My difference with the majority stems from the fact that, in my opinion, Levine's arrest did not subject him to such extraordinarily harmful circumstances as to justify an extension of the unusual relief he sought, even assuming the court possessed requisite power in the premises. Realistically, the relator was not likely to endure any greater harm than any other wrongfully arrested person suffers when the illy-advised prosecution is permitted to proceed to final determination in ordinary course. Levine was not a candidate for public office at the imminent municipal election but was merely an active supporter of a nominee to whose candidacy the instigator of the belated prosecution of the relator was openly hostile.

As I see it, this court's present decision approves an extension of the writ of *habeas corpus* beyond its heretofore recognized bounds and threatens to introduce a practice that may be used to impede, if not to thwart, orderly and expeditious exercise of the criminal process. The majority's caution that "We do not intend in this opinion to endorse any generalized application, through habeas corpus or otherwise, to a court to stay warrants of arrest when issued" may well prove ineffectual to stem the efforts of those who will attempt nonetheless to block criminal prosecutions; from which attempts, even though ultimately abortive, much unwarranted litigation is likely to ensue.

The hearing judge appears to have proceeded upon the assumption that the provisions of the Act of July 1, 1937, P. L. 2664, were applicable to the relator's petition. However, the procedure prescribed by that Act for testing the legality of the proceedings or the sufficiency of the evidence, as a result whereof the accused stands committed, does not become available until after the hearing at which the accused has been committed. The majority opinion expressly recognizes that the Act of 1937 is not applicable to the facts of this case.

There is a still further important aspect of the relator's status which does not appear to have been thoroughly litigated and determined, i.e., as to whether he was under actual physical custody or restraint when he sought release from his arrest. The *habeas corpus* Act of February 18, 1785, 2 Sm. L. 275 (12 PS §§1871, 1873, 1879-1891, inc.), which was a re-enactment of the *habeas corpus* act of 31 Car. 2, *c* 2, with several added sections not material to criminal matter, contemplates the *actual* physical restraint of a relator as a prerequisite to his deliverance pursuant to a writ of *habeas corpus*. See *Respublica v. Arnold et al.,* 3 Yeates 263,

265-266 (1801), which was cited with approval in *Wales v. Whitney,* 114 U. S. 564, 573, and *Stallings v. Splain,* 253 U. S. 339, 343; see also *Commonwealth v. Green,* 185 Pa. 641, 647-648, 40 A. 96, and *Commonwealth ex rel. Maisels v. Baldi,* 172 Pa. Superior Ct. 19, 21, 92 A. 2d 257, where it was correctly said to be "well settled that a person out on bail is not so restrained of his liberty as to be entitled to a writ of habeas corpus." It is also interesting to note that the Act of 1937, supra, likewise contemplates that its provisions shall be available only to those who are suffering *actual* physical restraint. By the very terms of the Act, it is "the prisoner" who may be discharged upon a proper showing in the premises; and, in legal parlance, a "prisoner" is "One held in confinement against his will". Nor may an accused create a restraint in order to seek enlargement upon a writ of *habeas corpus.* For example, a relator, who had been admitted to bail but thereafter surrendered himself to the sheriff, thus vacating the bail, lacked standing to petition for a writ for the reason that his physical restraint had been self-created. *Commonwealth v. Green,* supra. By like token, an accused at large on his own recognizance is not entitled to release on a writ of *habeas corpus.* The physical restraint requisite to the issuance of a writ of *habeas corpus* must be *actual* and not merely constructive or fictional.