## Commonwealth ex rel. Johnson v. Police Commissioner of Philadelphia

*Charles W. Bowser, Curtis C. Carson, A. Leon Higginbotham* and *Cecil B. Moore*, for relator.

*Thomas Shiomos,* for Commonwealth.

*Bernard L. Lemisch,* amicus curiae and for Fraternal Order of Police.

*Isadore H. Bellis,* amicus curiae and for Fraternal Order of Police and arresting officers individually.

ALEXANDER, J., April 11, 1960.—This matter is before the court upon relator's petition for a writ of habeas corpus.

Relator, A. Benjamin Johnson, a member of the Philadelphia bar, was arrested on February 10, 1960, by two Philadelphia police officers. Following a preliminary hearing on February 11 and 12, 1960, relator was held for court on the charges of interfering with a police officer and breach of the peace.

At the close of the preliminary hearing, the magistrate set bail in the amount of $500. Relator declined the proffered opportunity to be released in his own recognizance and remained in custody. He then petitioned this court for a writ of habeas corpus to test the validity of the evidence upon which he had been held.

Relator's petition came to the court's attention on February 12, 1960. A rule to show cause why the writ should not issue was allowed, returnable on February 16, 1960. A further hearing in the matter was held on February 19, 1960, at which time extensive oral arguments were presented by the attorneys for relator, the district attorney's office and counsel for the Fraternal Order of Police, who appeared as amicus curiae.

At the time of the allowance of the rule to show cause, bail was set in the amount of $300. Relator then posted bail and was released pending the hearing in the matter. Following the hearing and oral arguments, bail was continued pending final determination of relator's petition.

Section 5 of the Act of May 25, 1951, P. L. 415, 12 PS §1905, provides for the fixing of bail in cases such as this when a rule to show cause is allowed. The pertinent parts of that section are as follows:

". . . in awarding a rule to show cause, the judge shall fix a date for a hearing, which shall be held as promptly as may be, . . . and except when the relator is charged with a non-bailable offense or has been convicted and sentenced the judge may, in his discretion, fix bail in such amount as he deems appropriate for the appearance of the relator at the time and place of hearing and may order his discharge meanwhile."

The charges for which relator was held were bailable offenses and accordingly bail was set.

A preliminary issue is presented on the facts pertaining to relator's choosing to remain in custody after bail was set in the amount of $500 by the magistrate following the preliminary hearing of February 12, 1960. That issue is whether one who refuses to sign his own recognizance and chooses to remain in custody pending a petition for a writ of habeas corpus has, in effect, voluntarily chosen to remain in custody and thus forfeited his right to petition for a writ of habeas corpus.

Had relator in this case signed his own recognizance and thereby met the bail requirement imposed by the magistrate, the rule is clear that a petition for a writ of habeas carpus would not lie: Commonwealth ex rel. Maisels v. Baldi, 172 Pa. Superior Ct. 19, 92 A. 2d 257 (1952) ; United States ex rel. Holmes v. Prasse, 139 F. Supp. 806 (1956).

In the Maisels case, the court stated in a per curiam opinion, at pages 20-21:

"On April 4, 1952, relator appealed to this Court from the dismissal of his petition for writ of habeas

corpus. Relator at that time was not in the custody of respondent, the superintendent of county prison, on the original commitment.

"It is well settled that a person out on bail is not so restrained of his liberty as to be entitled to a writ of habeas corpus. 25 Am. Jur., Habeas Corpus, §24, p. 158. See, also, Commonwealth v. Green, 185 Pa. 641, 40 A. 96; Commonwealth ex rel. Glenn v. Gill, 10 Pa. C. C. 71."

It was for this reason that relator chose to remain in custody. He did not wish to forfeit his right to petition for the writ of habeas corpus. This court is of the opinion that relator proceeded properly in order to raise the issue of the validity of his confinement. He did not secure his release until bail had been fixed pursuant to the rule to show cause why the writ should not issue.

The writ of habeas corpus has been called the "freedom writ." It was inherited in this country from the English common law. Its purpose is to secure the immediate release of one who is unlawfully detained. The concept of habeas corpus was first put into the form of legislative enactment in 1679 in England, although its use as a common-law right predated the Habeas Corpus Act of that year. 61 Harvard Law Rev. 657 (1958) ; In re Williamson, 29 Pa. 9 (1855) ; Commonwealth ex rel. Milewski v. Ashe, 362 Pa. 48, 66 A. 2d 281 (1949).

It has been held that habeas corpus is the proper remedy for one who has been unlawfully arrested: Commonwealth v. Wideman, 150 Pa. Superior Ct. 524, 28 A. 2d 801 (1942). It may be used to test the validity of whether or not a prima facie case has been made out at a preliminary hearing before a magistrate provided the relator remains in custody until a rule to show cause is allowed: Act of May 25, 1951, P. L.

415, sec. 5, 12 PS §1905, supra. See Commonwealth ex rel. Tiller v. Dye, 177 Pa. Superior Ct. 388, 110 A. 2d 748 (1955).

The writ has been included in the Constitutions of Pennsylvania of 1790, 1838 and in the present Constitution of 1874 as article I, sec. 14. That provision recognizes the supreme importance of the "freedom writ" and provides that it shall not be suspended except in case of rebellion or invasion when the public safety may require it. The writ has never been suspended throughout the long history of the Commonwealth.

Similarly, the writ of habeas corpus has been the subject of numerous legislative enactments in Pennsylvania from 1785 to the latest enactment of 1951. The Act of July 1, 1937, P. L. 2664, secs. 1-4, 12 PS §1892-1895, substantially broadened the jurisdiction of the courts in habeas corpus proceedings to include petitions for the writ from hearings for summary offenses held before magistrates and justices of the peace: Section 2 of the Act, supra, 12 PS §1893.

Certainly, there is no dispute regarding the great importance and the wide area of applicability of the writ of habeas corpus. To argue that the writ does not lie when relator chooses to remain in custody pending a petition on his behalf would, in effect, place relator on the horns of a dilemma.

On the one hand, should realtor choose to enter bail as fixed by the magistrate, his right to test the validity of the decision of the hearing before the magistrate by a petition for writ of habeas corpus would be foregone. Commonwealth ex rel. Maisels v. Baldi, supra; Commonwealth ex rel. Tiller v. Dye, supra. On the other hand, should relator choose to remain in custody and forego the opportunity to test the legality of his commitment by petitioning for the writ of habeas

corpus, to hold that he is without this valuable remedy because he has, in effect, "voluntarily" remained in custody, would be a denial to him of his fundamental constitutional right and limit him to his defense before a trial court on a case, the merits and sufficiency of which are seriously in dispute. Such would, I am certain, be contrary to the intention of the legislature when it broadened the provisions of habeas corpus as expressed in the Act of July 1, 1937, supra, and would, as indicated above, leave relator without this great constitutional remedy.

In Commonwealth ex rel. Levine v. Fair, 394 Pa. 262, 284-85, 146 A. 2d 834 (1958), Mr. Justice Musmanno, writing the majority opinion of the court, stated:

"There is no locked door which may not be opened by the key of habeas corpus; there is no stone wall which may not be pierced by it, there is no enclosure which may not be entered by the person bearing this writ, which is now accepted as the greatest and most important remedy known to jurisprudence and which Blackstone called 'the most celebrated writ in the English law'. (3 Blackstone Comm. p. 129)

"Nor does one need to search through the books for a precedent for its application. Although the complexities of modern life are constantly expanding, and are now even travelling into spheres of conduct and human relationship reaching into the very spaces of the infinite, the principle of the right to untrammeled freedom of action is still the fixed star in the sky of the English-speaking world. Hence, no matter what may be the situation or how involved the circumstances, any person who claims he is illegally imprisoned or restrained of his liberty may have such claim inquired into by a competent court, and, if his claim is found to be well grounded, he will be discharged and freed of such restraint.

"The writ of habeas corpus in Pennsylvania may be molded to suit the exigencies of any particular case. . ."

Accordingly, it is held that the writ lies regardless of relator's opportunity to be released upon bail following the preliminary hearing and prior to the allowance of the rule to show cause.

The facts established at the preliminary hearing before the magistrate are the following:

On February 10, 1960, at approximately 5 p.m., Police Officers Primiano and Burke of the seventeenth police district, received a radio call to their patrol car advising them of a disorderly crowd at twenty-second and Dickinson Streets, Philadelphia. They proceeded to the location and dispersed a group of 15 or 16 boys who were congregated at that intersection. They next observed a second group of boys nearby at the intersection of Twenty-second and Cross Streets whom they dispersed from that location. At Twenty-second and Reed Streets, a full city block from the Dickinson Street corner, they observed a third group of six or seven boys, whom they also ordered to leave that corner. This group reacted by walking into the corner store located at this intersection.

The store was described as a candy store and luncheonette. It had a counter and stools for serving food to its patrons. It is operated by an uncle of relator.

The police officers followed the boys into the store and told them that they were being given a second chance and instructed them to go home. The boys were not disorderly in the store, nor had the proprietor of the store indicated to the officers that he wanted them to leave. Some of the boys complied with the officers' request and left the premises of the store.

Relator was seated upon a stool at the counter when the officers entered the store. He was drinking a glass of soda. When the officers instructed the boys to leave,

relator stated to the officers that they had no right to enter the store, nor to chase anyone out. Officer Primiano replied to relator that they were not chasing him out and that they were only chasing the boys who had been outside on the corner. He further told relator to mind his own business. Relator replied that it was his business. The officer then stated to relator that he was interfering with a police officer. Relator replied that the officer was no police officer and that he was only a man, to which Officer Primiano replied that he was also a police officer, that relator should mind his own business and that he had instructed the boys to leave. At this point, only two of the boys of the group of six or seven still remained in the store. The others had left the premises.

The argument between the officers and relator continued. Relator stated he did not think that the officers had a right to order the boys out of the store and to order them to go home. Officer Primiano replied that relator was interfering with a police officer, which statement he repeated three or four times to relator, and finally he told relator that he was going to arrest him.

They then exchanged opinions as to whether or not the officers could arrest relator and, finally, Officer Primiano announced to relator that he was under arrest. Relator told the officers that they would have to take him out and would have to put an arm on him, to which Officer Primiano asked relator whether he was resisting arrest. Relator then stated that he would go with the officers, left the store and was taken to the Seventeenth police district, Twentieth and Federal Streets, Philadelphia.

Relator had remained seated on the luncheonette stool at the beginning of his interjection and protest. When he was told to mind his own business, he got up from the stool and approached the officers. He had the

glass of soda in his hand which he had been drinking prior to the incident. He did not make any threatening gesture with the glass. He did not use any profanity nor had he been drinking any alcoholic beverage prior to the incident.

There were two women behind the luncheonette counter during the argument. The officers stated that relator became loud and boisterous, and Officer Primiano stated that he became loud in reply to relator's statements.

In view of the relatively simple facts in this matter and the further fact that the two arresting officers testified substantially identically in regard to the incident and, further, their testimony was fully presented at the preliminary hearing before the magistrate, the court concluded that it was unnecessary for any further testimony of witnesses at the time of the hearing and argument upon the instant writ. Such a decision lies within the sound discretion and judgement of the court: Act of July 1, 1937, P. L. 2664 sec. 1, 2, 12 PS §1892, 1893. See also Commonwealth ex rel. Scolio v. Hess, 149 Pa. Superior Ct. 371, 374 (1942) ; Commonwealth ex rel. Kitchen v. Burke, 175 Pa. Superior Ct. 597, 601-02 (1954).

Let us examine the charges upon which the relator was held:

1. *Interfering with a police officer.*

This is set forth in The Penal Code of June 24, 1939, P. L. 872, as amended, 18 PS §4314, as follows:

"Whoever knowingly, wilfully and forcibly obstructs, resists or opposes any officer or other person duly authorized, in serving or attempting to serve or execute any legal process or order, or in making a lawful arrest without warrant, or assaults or beats any officer or person, duly authorized, in serving or executing any such legal process or order or for and be-

cause of having served or executed the same; or in making a lawful arrest without warrant; or rescues another in legal custody; or whoever being required by any officer, neglects or refuses to assist him in the execution of his office in any criminal case, or in the preservation of the peace, or in apprehending and securing any person for a breach of the peace, is guilty of a misdemeanor . . ."

The facts establish that the police officers were not serving or attempting to serve legal process, nor were they in the process of making a lawful arrest. They testified that they had merely instructed the six or seven boys to leave the corner and then to leave the store and to go home. They had not received any complaint regarding this particular group of boys. They testified that they took this action because the boys were "milling around" on the corner, although there was no disorderly conduct on the boys' part, nor was there any indication that they were acting in breach of the peace or in any other unlawful manner. The boys' behavior, as described by the officers, was not such as to amount to loitering as set forth in the Code of General Ordinances of the City of Philadelphia, §10-603. Likewise, since there was no arrest to be made, no clear requirement of relator to assist the officers, no execution of the officers' duty in a criminal case, no breach of the peace and no apprehension of any person for fear that a breach of the peace would be committed, the police officers' entry into the corner store lacked any of the essential elements necessary in order for relator to have unlawfully interfered with them or prevented them from executing a duty pursuant to this section of The Penal Code. See Commonwealth v. Frankfeld, 114 Pa. Superior Ct. 262, 268 (1934); Commonwealth ex rel. Walker v. Sheriff of Philadelphia County, 3 Brewster 343 (1869).

## 2. *Breach of the Peace.*

Relator's argument with the police officers was not such as to create a public disturbance. The argument was confined to the area of the interior of the store and did not amount to a disturbance of the public peace. There was neither violent nor profane language used by relator.

The offense of breach of the peace is a common-law offense and is not defined in The Penal Code. The offense is mostly closely allied with that of disorderly conduct, which is defined by The Penal Code of 1939, sec. 406, 18 PS §4406, as follows:

"Whoever wilfully makes or causes to be made any loud, boisterous and unseemly noise or disturbance to the annoyance of the peaceable residents near by, or near to any public highway, road, street, lane, alley, park, square or common, whereby the public peace is broken or disturbed or the traveling public annoyed, is guilty of the offense of disorderly conduct . . ."

It is clear that this section of the code does not apply to relator's argument with the police officers, since there was no annoyance of nearby residents nor annoyance of the peace in any of the public places enumerated in the section.

Accordingly, the charge of breach of the peace does not lie against relator in this matter.

The district attorney suggests in his brief that relator may be held on the charge of assault, since he moved off the stool at the counter towards the police officers with a partially filled soda glass in his hand. Such movement in the most extreme imagination cannot be construed as an assault. There was not the slightest threatening gesture made by relator in this movement. The testimony of the police officers themselves establishes that there was no physical demon-

stration by relator nor were they ever in fear of being assaulted by relator during the argument.

The court fully recognizes the difficulties which confront police officers in carrying out their patrol duties in the crowded areas of large cities. Their patrol assignments are often arduous and trying and, understandably, many of their decisions must be made momentarily in order to cope with immediate problems. The *disorderly conduct* of groups of boys upon street corners is a problem of every crowded city. However, we must consider each case on its own merits and the record presented to us. In this case, the record does not establish any *disorderly conduct* on the part of the group of boys immediately concerned and involved in this case which is before us for decision. Therefore, their presence on the corner of Twenty-second and Reed Streets was not such as to warrant them being chased or told to go home.

Relator's verbal conduct in this matter was not above reproach and is to be regretted, but undoubtedly he was provoked by what he believed to be an injustice, that of ordering the boys from his uncle's luncheonette when they were lawfully upon the premises and were creating no disorder whatever, and against whom there was not the slightest complaint by the proprietor of the store to the police or to anyone else.

Accordingly, the court enters the following

*Order*

And now, to wit, April 11, 1960, upon consideration of the record in this case, the complete testimony taken before the magistrate, a careful study of the issues, legal arguments and briefs supplied by all the parties that participated in this case, in accordance with the foregoing opinion, it is hereby ordered, adjudged and decreed that the petition is granted, and the relator is discharged from further proceedings in this case.