411 A.2d 1224

**COMMONWEALTH of Pennsylvania, Appellant,**

v.

**Francis J. LYNCH (two cases).**

**COMMONWEALTH of Pennsylvania, Appellant,**

v.

**Stephen R. WOJDAK (two cases).**

Superior Court of Pennsylvania.

Argued March 21, 1979.

Filed Oct. 12, 1979.

Reargument En Banc Denied Feb. 25, 1980.

Petitions for Allowance of Appeal Granted May 5, 1980.

558

Eric B. Henson, Assistant District Attorney, Philadelphia, for Commonwealth, appellant.

Barry Schwartz, Philadelphia, for appellee Lynch.

Donald J. Goldberg, Philadelphia, for appellee Wojdak.

Before VAN der VOORT, HESTER and MONTGOMERY, JJ.

HESTER, Judge:

By order of the Supreme Court dated February 28, 1979, (Allocatur Docket No. 3926) we have been directed to rule on the Commonwealth's petitions[1] to extend the time under Pa.R.Crim.P. 1100(c) for bringing the defendants to trial, in conjunction with our decisions in the Commonwealth appeals from the granting of the writs of habeas corpus and the discharge of the defendants by the lower court (Lavelle, J.) which are now before us. Therefore, we must first direct our attention to the habeas corpus matters since the Rule 1100 issue becomes moot if the orders of the lower court discharging the defendants are affirmed.

## A. HISTORY OF THE CASE

On or about September 26, 1976, Criminal Informations were filed by the District Attorney of Philadelphia County against the defendant-appellee Francis J. Lynch and a co-defendant-appellee, Stephen R. Wojdak, charging them with (1) bribery in official and political matters (18 C.P.S.A. § 4701), (2) conspiracy to commit theft by deception, bribery, speculating or wagering on official action or information, theft by extortion, and official oppression (18 C.P.S.A. § 903), (3) speculating or wagering on official action or information (18 C.P.S.A. § 5302), (4) attempt—official oppression (18 C.P.S.A. §§ 901, 5301), (5) attempt—theft by

[1]. The petitions were filed in the lower court as a cautionary measure should the Commonwealth appeals be allowed. Having been filed subsequent to the filing of the appeals in the habeas corpus proceeding to this Court, they were denied for the reason that the lower court no longer had jurisdiction. The Commonwealth appealed from that order at 1518 October Term 1978 and 1519 October Term 1978 and simultaneously filed similar petitions with the court which were denied with a per curiam order dated August 14, 1978. A petition for allocatur followed which resulted in the Supreme Court order of February 28, 1979.

extortion (18 C.P.S.A. §§ 901, 3923), (6) attempt—theft by deception (18 C.P.S.A. §§ 901, 3922), and (7) attempt—speculating or wagering on official action or information (18 C.P.S.A. §§ 901, 5302).

On November 10, 1976, Judge G. Thomas Gates, 52nd Judicial District, specially assigned, ruled that the defendants were to be afforded a preliminary hearing. The hearing was held July 19, 1977. Judge Gates, who presided over the preliminary hearing, dismissed Informations 1426 and 1434 September Term, 1976, charging attempts to commit official oppression, and determined that defendants be held for court on the remaining charges.[2] He directed that the defendants be released on their own recognizance. The defendants, not having entered into any recognizances or bonds to secure their release, continued in the custody of their counsel as directed earlier by Judge Richette.

Counsel for defendants, on or about October 6, 1977, petitioned for writs of habeas corpus to test the sufficiency of the evidence presented by the Commonwealth at the preliminary hearing to warrant the detention of the defendants on the charges on which they were held by Judge Gates.

The habeas corpus petitions were considered by Judge Lavelle, 21st Judicial District, also specially assigned, on the record made at the preliminary hearing before Judge Gates. Judge Lavelle discharged the appellees on all counts. The Commonwealth then appealed.

**2.** The charges of attempted official oppression, on Informations 1426 and 1434 September Term, 1976 were dismissed by the lower court after the preliminary hearing and such action has not been the subject of an appeal to our Court by the Commonwealth. The preliminary hearing court made no disposition of the conspiracy count against each appellee with respect to the crime of official oppression. Neither the habeas corpus court, nor the parties to this appeal have made any mention of the conspiracy count which concerned the charge of official oppression. Since the preliminary hearing court found no evidence sufficient to hold either of the appellees on the charge of attempted official oppression, it stands to reason that there is no evidence that either appellee conspired with any other person to commit that offense. Thus, the appellees must be considered to have been discharged on the conspiracy count with respect to that crime. We find no reason to disturb that result.

Although the evidence in this case has been considered by a special investigating grand jury, which made presentments that formed the basis for the informations filed by the Philadelphia District Attorney, and by Judge Gates and Judge Lavelle, it now becomes our duty to review it again to determine whether it is sufficient to establish prima facie cases against the defendants on any or all of the charges. The only issue presented to us in the habeas corpus appeals is the sufficiency of the evidence given at the preliminary hearing before Judge Gates.[3]

Our examination of the record made before Judge Gates indicates the following evidence: viz

In the fall of 1975, Dr. Donald Goldenberg, a Philadelphia practicing dentist, being desirous of having his son, Andrew, admitted to the Dental School of Temple University, sought recommendations from various persons he thought had influence with that school. One of those solicited was Dr. Edward Cook, an officer of the Alumni Association of Temple University. Dr. Goldenberg told him he would make a substantial contribution to Temple University if his son was accepted. By the spring of 1976, his son not having received notice of his acceptance, he then sought the help of a friend and patient, Samuel Biener, whom he knew had political influence. When contacted, Mr. Biener said he would see what he could do and suggested that a fee might be required. In later discussions, Mr. Biener stated the fee would be $15,000 in cash and that he could be of assistance. In early May, Mr. Biener requested a transcript of Andrew's grades, which was supplied. The next time Mr. Goldenberg heard from Mr. Biener was on June 29th when Mr. Biener called him and told him that his "boy is in" and "to get the package ready" meaning the money. However, on the same day, June 29th, 1976, prior to receiving the call from Mr. Biener, Dr. Goldenberg had received a call from Dr. Cook congratulating him on the acceptance of his son and inform-

---

**3.** It has been held that the method for testing a finding of a *prima facie* case pre-trial, within our Commonwealth, is by a writ of habeas corpus. *Commonwealth v. Hetherington*, 460 Pa. 17, 331 A.2d 205 (1975).

ing him he would be receiving a letter of acceptance in the mail.

Realizing he was obligated on his promise to Dr. Cook for a contribution to Temple University and on his promise to Mr. Biener, Dr. Goldenberg went to Atlantic City to discuss the matter with his wife and from there he called Dr. Cook between 9 and 10 that evening, informing him of his dilemma. Following this conversation, he called Mr. Biener and told him he had information from inside the school that his son had been admitted on his own record and without any influence from friends of politicians, and he was going to check on it, which he did through phone calls to the Dean, the President of the school, the Vice President and some of the teachers. The next day or the day thereafter, he received another phone call from Mr. Biener and was told that he also had confirmed that Andrew had been admitted "without any help and to forget about it."

Dr. Goldenberg had never heard of the defendants, Senator Lynch or Mr. Wojdak, a member of the Pennsylvania House of Representatives; and it was stipulated they had done nothing to accomplish the acceptance of Andrew by Temple University.

Following his conversation with Dr. Goldenberg in which $15,000.00 was suggested as the fee for accomplishing the admission of Andrew, Mr. Biener had contacted the defendant, Senator Lynch and told him, "I have a boy that wants to get into dentistry and I can get ten thousand dollars".[4] Senator Lynch said, "I will get back to you". The foregoing is the entire record relating to Biener's first contact with appellee Lynch. About two weeks later, Biener received a call from Senator Lynch asking him to get a transcript of

---

4. Mr. Biener explained the discrepancy between the $15,000.00 suggested to Dr. Goldenberg and the $10,000.00 stated to Senator Lynch testifying, "I was trying to turn around, to turn around the five thousand dollars, because he was a friend of my son". And in answer to the question "You were not going to keep the five thousand dollars?", he replied, "No." However, he never mentioned this reduction in the fee to Dr. Goldenberg at any time, even when he asked him to prepare "the package".

the boy's grades. In response, Mr. Biener received the transcript of Andrew Goldenberg's grades as previously stated and delivered it to Senator Lynch personally. Two weeks later, Senator Lynch called him again, asking for the boy's first name, which he secured and gave to Senator Lynch by phone, and again the Senator said he would get back to him.

Thereafter, following the conversation between Dr. Goldenberg and Mr. Biener on June 29th, during which Dr. Goldenberg told Mr. Biener his boy had been accepted without his help, Mr. Biener called Senator Lynch and told him "the boy got in on his own, you didn't do nothing. Let's forget about it, I will get back to you." Senator Lynch did not reply at this time, but a day or two later called Mr. Biener and said "they are going to try and stop the letter", referring to the letter of Andrew's acceptance. This was followed by a later call from Senator Lynch to Mr. Biener telling him, "They couldn't stop the letter—and for me to stay away from him, The Doctor—you are going to get boxed in."

Thomas W. Elliott, Assistant Vice President of Governmental Relations at Temple University, is a registered lobbyist in Harrisburg. On June 30, 1976, he received information that he was to contact Mr. Wojdak's office in Harrisburg. He went there and was instructed to and did call Mr. Wojdak, who was then a patient in a Philadelphia hospital. Wojdak asked Elliott to check on the Dental School admission of any applicant named Rosenberg. Mr. Elliott then called the admissions office of Temple University Dental School to inquire whether an applicant named Rosenberg had been recently admitted and was told "No." He again called Mr. Wojdak and gave him that information. He was asked to check again for anyone with a similar sounding name and was advised a person named Goldenberg had been accepted. He again called Mr. Wojdak and relayed the information to him. In this conversation, Mr. Wojdak inquired whether the letter of acceptance had gone out, and if it had not, "could it be held for a day." After several more calls between Mr. Elliott and the admissions office, it was

determined that the letter had in fact been mailed and Mr. Wojdak was again called and so advised, and he replied, "They are trying to go around me."

Mr. Elliott keeps a list of applicants for admission to Temple University in whom legislators have shown an interest and as a general policy notifies those persons when the University takes action on the applications. In this case, he felt he was in the middle of something and was being "used". Mr. Wojdak had shown no previous interest in Andrew Goldenberg, although he frequently indicated an interest in other applicants. On the other hand, Senator Lynch rarely, if ever, had indicated such an interest. Mr. Wojdak and the Senator were members of the State Legislature and joint occupants with two other persons of an apartment in Harrisburg. Mr. Biener did not know Mr. Wojdak and never had any contact with him.

The Commonwealth finally submitted Exhibit C–1 (telephone records) showing various phone calls were placed at divers times between Biener and Dr. Goldenberg, Biener and Lynch, and between Wojdak and his Harrisburg apartment. The Commonwealth concedes these records were not strictly necessary to establish a *prima facie* case. The Exhibit fails to demonstrate that: 1) Lynch called Wojdak and spoke to him about the Goldenberg matter; 2) Biener ever called Wojdak; or 3) Wojdak ever spoke with Lynch about the matter.

■ At this point, it is appropriate to observe that our review is limited to deciding whether a *prima facie* case was established at the preliminary hearing. The preliminary hearing is, of course, designed to protect an individual, accused of criminal conduct, from unlawful detention. *Commonwealth v. Prado*, 481 Pa. 485, 393 A.2d 8 (1978). At such a proceeding, the prosecution has the burden to establish at least a *prima facie* case that a crime has been committed and the accused is the one who committed it.[5] *Commonwealth v.*

5. An interesting analysis of the burden of proof at a preliminary hearing in our Commonwealth is set forth in Lehrer and Lewis, *The*

*Mullen*, 460 Pa. 336, 341, 333 A.2d 755 (1975). Proof of guilt beyond a reasonable doubt is clearly not required at this stage. *Commonwealth v. Rick*, 244 Pa.Super. 33, 366 A.2d 302 (1976). Rather, our cases hold that the Commonwealth must show "sufficient probable cause" that the defendant committed the offense. *Commonwealth v. Smith*, 212 Pa. Super. 403, 244 A.2d 787 (1968). In *Commonwealth ex rel. Scolio v. Hess*, 149 Pa.Super. 371, 374–375, 27 A.2d 705, 707 (1942), the Court stated that the evidence should be such that if presented at trial in court, and accepted as true, the judge would be warranted in allowing the case to go to the jury.

With such standards to guide us, we can now proceed to examine in detail the charges against appellees and the evidence in support thereof.

We will consider each appellee in turn.

### B. Commonwealth v. Lynch

The Commonwealth's case against Senator Lynch clings precariously to a series of six brief phone conversations between Lynch and Samuel Biener, as related by the latter. These conversations establish at best that Lynch was aware of the potentially criminal nature of the transaction between Biener and Dr. Goldenberg, but it was not affirmatively demonstrated, under the appropriate legal standards, that Lynch took an active role in their dealings. The Commonwealth's evidence proved no more than: 1) Lynch was aware Biener wished to obtain money illegally in return for his (Biener's) influence in admitting "a boy" into dentistry (first phone conversation, RR 86a); 2) Lynch desired the boy's name and college transcripts (second and third conversations, RR 87a–88a); 3) Lynch became aware the Goldenberg boy was admitted on his own merits without improper influence (fourth conversation, RR 89a); 4) Lynch was aware someone was going to try to stop the letter of acceptance to the boy (fifth conversation, RR 90a); 5) Lynch was aware the attempt was unsuccessful and that Biener

should stay away from Dr. Goldenberg (sixth conversation, RR 91a). There is no showing Lynch shared any criminal intent with either Biener or appellee Wojdak (assuming Wojdak himself was shown to have such intent, an assumption we shall disprove in part B, herein). The further conclusions and deductions urged by the Commonwealth, as more fully discussed below, are either not supported by the record, or are inferences based upon inferences without logical nexus. As such, even the minimum requirements of a *prima facie* case, as set forth in *Commonwealth v. Prado*, 481 Pa. 485, 393 A.2d 8 (1978) and related cases, are not satisfied.

### 1. Bribery

■ Lynch was charged with bribery (18 Pa.C.S.A. § 4701)[6] and conspiracy to commit bribery, (18 Pa.C.S.A. § 903), the indictments charging appellee agreed to accept a pecuniary benefit from Dr. Goldenberg and from Wojdak and "others" in return for his influence on behalf of the Goldenberg boy. The Commonwealth urges it may "properly be inferred" that Lynch agreed to accept money in return for his recommendation to Temple that the Goldenberg boy be admitted to Dental School. "[T]he record adequately supports the conclusion that [appellee Lynch] agreed to accept funds from Mr. Biener." Commonwealth brief at p.

**6.** Bribery is defined as:
(a) Offenses defined—A person is guilty of bribery, a felony of the third degree, if he offers, confers or agrees to confer upon another, or solicits, accepts or agrees to accept from another:
(1) any pecuniary benefit as consideration for the decision, opinion, recommendation, vote or other exercise of discretion as a public servant, party official or voter by the recipient;
(2) any benefit as consideration for the decision, vote, recommendation or other exercise of official discretion by the recipient in a judicial, administrative or legislative proceeding;
(3) any benefit as consideration for a violation of a known legal duty as public servant or party official.
(b) Defenses prohibited—It is no defense to prosecution under this section that a person whom the actor sought to influence was not qualified to act in the desired way whether because he had not yet assumed office, had left office, or lacked jurisdiction, or for any other reason.
Crimes Code, Act of December 6, 1972, P.L. 1482, No. 334, § 1 (18 Pa.C.S.A. § 4701).

29. In our view, however, the testimony of Mr. Biener does not support such a conclusion. During direct examination, Biener stated:

Q. What was the content of your conversation with Senator Lynch?

A. I told him, I have got a boy that wants to get into dentistry and I can get Ten Thousand Dollars.

Q. Ten Thousand Dollars?

A. So I can get Ten Thousand Dollars.

Q. What did Senator Lynch say?

A. He said I will get back to you and that's all. R.R. 86a.

The following transpired during cross-examination:

Q. Now, all that Senator Lynch said to you, according to your testimony was I will see what I can do, correct?

A. That's right.

Q. Senator Lynch certainly didn't say to you that it would cost Fifteen Thousand Dollars?

A. He didn't give me no price whatsoever. I gave him the price. RR 94a.

The absence from the record of an essential element of § 4701, an acceptance or agreement to accept a benefit, is apparent. The mere statement to Lynch that "I can get ten thousand dollars" does not in any way lead to the conclusion that Lynch was to receive the money or any part thereof. By the Commonwealth's interpretation, instead of, "*I* can get $10,000", we must read "*You* can get $10,000." Certainly, Lynch became aware, or should have been aware, that Biener was promised a large sum of money for getting the boy into school, but nowhere is there a suggestion that Lynch either solicited, accepted, or agreed to accept any part of the money Biener sought to shake down from Dr. Goldenberg. The Commonwealth, in fact, concedes in this Court that it may be an invalid inference that Lynch expected to receive a pecuniary benefit from Biener or from anyone else. Commonwealth brief at p. 23. The lower court so found

and, indeed, the testimony of Biener we have quoted leads to no other conclusion.

In recent bribery convictions sustained by this Court, the evidence has always unequivocally demonstrated that the accused actually conferred or received a benefit in return for the improper use of the recipient's office as a public servant. It was not necessary in these cases to weave a long string of inferences in order to reach a conviction. See, e. g. *Commonwealth v. Kelly*, 245 Pa.Super. 351, 369 A.2d 438 (1976) (receipt of funds by police officer in exchange for police protection of gambling operation); *Commonwealth v. Staudenmayer*, 230 Pa.Super. 521, 326 A.2d 421 (1974) (receipt by police sergeant of funds in exchange for protection of numbers operation and vice figures); *Commonwealth v. Wright*, 227 Pa.Super. 134, 323 A.2d 349 (1974) (accused, police officer, confers funds upon fellow police officer in exchange for latter's protection of gambling operation); *Commonwealth v. Armbruster*, 225 Pa.Super. 415, 311 A.2d 672 (1973) (receipt by police detective of property in exchange for protection of offeror's husband); cf. *Commonwealth v. Bellis*, 484 Pa. 486, 399 A.2d 397 (1979). Where, however, there is no actual exchange of funds, and the evidence instead hinges upon an executory agreement to receive, the Supreme Court has long insisted on something more than "inference upon an inference". See, e. g., *Commonwealth v. Yobbagy*, 410 Pa. 172, 188 A.2d 750 (1963) (statement by accused, water pollution investigator, to victim that strip mine violation could be "taken care of" by "talking to" alleged co-conspirator, held, insufficient to implicate accused in extortion-bribery scheme); cf. *Commonwealth v. Bausewine*, 354 Pa. 35, 46 A.2d 491 (1946); compare, *Commonwealth v. Blatstein*, 231 Pa.Super. 306, 332 A.2d 510 (1974) (mention by accused to victim of specific sum of money in return for awarding lucrative stadium contract to victim's company, held, sufficient to sustain conviction for bribery and related offenses; *Yobbagy* and *Bausewine* distinguished).

In the instant case, it may well be that appellee Lynch, in a conversation not appearing in the record, did agree to

accept part of the money at issue. As such, however, it was incumbent upon the Commonwealth to establish, *prima facie*, the substance of that agreement or understanding. No such evidence was forthcoming in the testimony below.

Conceding that its inferences are, perhaps, invalid, the Commonwealth nonetheless insists, on a conspiracy theory, that criminal liability may still attach on the bribery charge. 18 Pa.C.S.A. § 903.[7] We recognize that, upon a showing of a conspiratorial relationship, that is, of shared criminal intent, one may be held criminally responsible for the acts of others, i. e., the act of one becomes the act of all. *Commonwealth v. Sullivan*, 472 Pa. 129, 371 A.2d 468 (1977); *Commonwealth v. Menginie*, 477 Pa. 156, 383 A.2d 870 (1978); *Commonwealth v. Roux*, 465 Pa. 482, 350 A.2d 867 (1976); *Commonwealth v. Bryant*, 461 Pa. 309, 336 A.2d 300 (1975); cf. 18 Pa.C.S.A. § 306. The unlawful agreement, the heart of every conspiracy and the nexus which will invoke principles of vicarious liability, will rarely be proven by direct evidence of a formal agreement with precise terms. Indeed, the very nature of the crime of conspiracy makes it susceptible to proof usually by circumstantial evidence. Thus, the courts have traditionally looked to the relation, conduct, and circumstances of the parties and the overt acts of the co-conspirators in order to find a corrupt confederation. *Commonwealth v. Dolfi*, 483 Pa. 266, 396 A.2d 635 (1979); *Commonwealth v. Waters*, 463 Pa. 465, 345 A.2d 613

7. § 903 provides in pertinent part:
 (a) Definition of conspiracy—A person is guilty of conspiracy with another person or persons to commit a crime if with the intent of promoting or facilitating its commission he:
 (1) agrees with such other person or persons that they or one or more of them will engage in conduct which constitutes such crime or an attempt or solicitation to commit such crime; or
 (2) agrees to aid such other person or persons in the planning or commission of such crime or of an attempt or solicitation to commit such crime.
 (b) Scope of conspiratorial relationship—If a person guilty of conspiracy, as defined by subsection (a) of this section, knows that a person with whom he conspires to commit a crime has conspired with another person or persons to commit the same crime, he is guilty of conspiring with such other person or persons, to commit such crime whether or not he knows their identity.

(1975); *Commonwealth v. Henderson,* 249 Pa.Super. 472, 378
A.2d 393 (1977); *Commonwealth v. Kinsey,* 249 Pa.Super. 1,
375 A.2d 727 (1977); *Commonwealth v. Holman,* 237 Pa.Su-
per. 291, 352 A.2d 159 (1975); *Commonwealth v. Esposito,*
236 Pa.Super. 127, 344 A.2d 655 (1975); *Commonwealth v.
Minnich,* 236 Pa.Super. 285, 344 A.2d 525 (1975). Regardless
of the type of proof advanced by the Commonwealth, how-
ever, proof of a common understanding among the alleged
co-conspirators is an indispensable element of the crime.
Thus, the courts have held that mere association is not
sufficient; *Commonwealth v. Perdie,* 249 Pa.Super. 406, 378
A.2d 359 (1977); *Commonwealth v. Murray,* 246 Pa.Super.
422, 371 A:2d 910 (1977); *Commonwealth v. Minor,* 227
Pa.Super. 343, 322 A.2d 717 (1974); nor is mere presence at
the scene of the crime sufficient to prove the agreement
without a showing that the accused had prior knowledge of
his alleged co-conspirator's criminal intent. *Commonwealth
v. Cox,* 466 Pa. 582, 353 A.2d 844 (1976); *Commonwealth v.
Fields,* 460 Pa. 316, 333 A.2d 745 (1975); cf. *Commonwealth
v. Flowers,* 479 Pa. 153, 387 A.2d 1268 (1978); *Common-
wealth v. Finley,* 477 Pa. 382, 383 A.2d 1259 (1978). Indeed,
one's knowledge that another proposes unlawful action will
not establish a conspiracy, *Commonwealth v. Goodyear,* 235
Pa.Super. 544, 344 A.2d 672 (1975); *Commonwealth v. Ste-
phens,* 231 Pa.Super. 481, 331 A.2d 719 (1974), absent proof
that the accused became an *active partner* in the criminal
enterprise with knowledge of the agreement. *Holman,* su-
pra; *Commonwealth v. Wright,* 235 Pa.Super. 601, 344 A.2d
512 (1975).

■ Appellee Lynch concedes, as he must, that Biener is
culpable in the shakedown of Dr. Goldenberg and that, if an
unlawful agreement is proven, he can be held accountable
for Biener's acts. But the lower court found, and we agree,
that *prima facie* proof of an agreement between the two is
wholly lacking. Biener never stated he offered Lynch any
money, ("I can get ten thousand dollars"), or that Lynch
requested money. Nor did Biener in his testimony suggest
that Lynch agreed to exercise his discretion or violate a

public duty in the exercise of a governmental function in return for a pecuniary benefit. 18 Pa.C.S.A. § 4701(a). The particulars of Biener's conversation with Dr. Goldenberg were never, in fact, conveyed to Lynch. The Commonwealth would have us infer an agreement because Lynch did not "terminate the conversation, express shock, or report the matter to the authorities." Commonwealth Brief at p. 18. However, all we may properly impute to Lynch is knowledge that Biener was involved in an illegal operation. This case thus closely resembles those where we found an accused's knowledge of a crime or proposed crimes does not, without more, implicate him in a conspiracy. In *Commonwealth v. Stephens,* supra, the accused was standing nearby when his alleged co-conspirator offered to sell marijuana to a plain-clothes police officer. From Stephens' mute and unresponsive reaction to the unlawful deal, the Commonwealth sought to infer that he had prior knowledge of the deal and in fact made an agreement prior to it. We rejected this contention, noting:

> Appellant did not induce Cafurello, [the alleged co-conspirator] to sell marijuana, nor did he aid or assist him at the time of the sale. There was also no showing that appellant had received any money from Cafurello. In short, the only thing that was shown was that appellant stood mute and unresponsive after overhearing the conversation between the [police officer] and Cafurello. That evidence, while supporting an inference of knowledge, cannot support the further inference of agreement. 231 Pa.Super. at 489, 331 A.2d at 723 (1974).

Similarly, in *Commonwealth v. Goodyear,* supra, the accused was present and had knowledge that his brother gave purported marijuana to a nine year-old boy. Upon such facts, we could find no evidence of an agreement to corrupt the morals of the boy. Our subsequent cases have consistently held that knowledge of, even tacit consent to, a crime will not permit an inference of an unlawful agreement, absent a showing that the parties acted with a common and corrupt purpose in view. See, e. g., *Commonwealth v. Fields,* 460

Pa. 316, 333 A.2d 745 (1975) (appellant's arrival at scene of shooting with the actual perpetrator, and then their flight after shooting, held, insufficient to establish unlawful agreement); *Commonwealth v. Pittman,* 259 Pa.Super. 146, 393 A.2d 759 (1978) (accused's presence at scene and acquaintance with shoplifting suspect, held, insufficient to show agreement); cf. *Commonwealth v. Anderson,* 265 Pa.Super. 494, 402 A.2d 546 (1979). In each of the foregoing cases, the accused did not "express shock, terminate [the crime], or report the matters to the authorities", yet the courts could not find a conspiracy. Moreover, Lynch's actions subsequent to the first phone conversation, inquiring after the Goldenberg boy's name and transcripts, do not operate to create an inference of conspiracy. Mr. Elliott, the registered lobbyist, testified it is not at all unusual for the university to receive inquiries from legislators and other community leaders pertaining to the status of admission applicants. R.R. 116a. While Lynch's actions may raise a suspicion and lead us to conjecture as to his motivation for the inquiries, such speculation has no place in our analysis particularly where, as here, his actions are satisfactorily explained by the Commonwealth's own witness. Further, his awareness that "they" were going to try to stop the letter of acceptance, again, only proves his knowledge of the operation involving Mr. Biener and does not in any way suggest he was an active partner therein or that he was an instigator of the attempted delay in sending the letter out. The Commonwealth's conclusion that Lynch intended to attempt to stop the letter (Brief at p. 24) is an exercise in conjecture absent proof that he had more than mere knowledge of such an attempt and that he was actively involved in the scenario. There is lacking, in short, those elements of "informed and interested cooperation, stimulation, instigation", which would permit us to leap from mere conjecture to a *prima facie* case. *Commonwealth v. Stephens,* supra, quoting *Direct Sales Company v. U. S.,* 319 U.S. 703, 713, 63 S.Ct. 1265, 1270, 87 L.Ed. 1674 (1943). As we fail to find adequate proof of a conspir-

acy between Lynch and Biener, we hold appellee not accountable for Biener's actions.

The conspiracy indictment also charges that Lynch conspired with appellee Wojdak to commit the crime of bribery. We are urged to find that such a conspiracy did exist based upon two facts: 1) both appellees were members of the State Legislature and shared an apartment in Harrisburg; and 2) both expressed an interest in the same dental school applicant. Assuming that appellee Wojdak is *prima facie* guilty of a crime for which Lynch could be vicariously liable, we think this case is an example of mere association being insufficient to prove an agreement. Our courts have consistently rejected the notion of inferring an unlawful confederacy from the mere status of association, professional or otherwise, among alleged conspirators. See, e. g. *Commonwealth v. Bertels,* 260 Pa.Super. 496, 394 A.2d 1036 (1978) (appellants' status as corporate officials insufficient to allow inference of conspiracy); *Stephens,* supra (drug dealer's status as tenant and part-time employee of appellant insufficient to establish conspiracy); *Yobbagy,* supra, (appellants' status as Commonwealth employees inspecting strip mine together insufficient to prove unlawful agreement; *Anderson,* supra (woman's status as common law wife of appellant insufficient to establish conspiracy in drug sale); *Holman,* supra ("mere happening of a crime in which several people participate does not of itself establish a conspiracy among those people"). Here, neither the rooming association of the appellees (*Anderson, Stephens*), nor their professional relationship (*Yobbagy, Bertels*) will permit us to conclude, without more, that they entered into a conspiracy. To infer that Lynch communicated with Wojdak concerning the Goldenberg boy, while possibly true, has simply not been affirmatively demonstrated by the Commonwealth, either directly or circumstantially. Indeed, the Commonwealth concedes it cannot prove that Lynch spoke with Mr. Wojdak on June 29th or 30th about Goldenberg or any other matter and to infer such is to take a giant leap from the barren facts of record.

## 2) Speculating or Wagering on Official Action or Information

 Lynch was charged with Speculating (18 Pa.C.S.A. § 5302)[8] as well as conspiracy and attempt to commit the crime (§§ 903, 901)[9]. This statutory provision has only been

**8.** § 5302 provides:

A public servant commits a misdemeanor of the second degree if, in contemplation of official action by himself or by a governmental unit with which he is associated, or in reliance on information to which he has access in his official capacity and which has not been made public, he:

(1) acquires a pecuniary interest in any property, transaction or enterprise which may be affected by such information or official action;

(2) speculates or wagers on the basis of such information or official action; or

(3) aids another to do any of the foregoing.

**9.** § 901 of the Crimes Code (Attempt) provides:

(a) Definition of attempt. A person commits an attempt when, with intent to commit a specific crime, he does any act which constitutes a substantial step toward the commission of that crime.

(b) Impossibility. It shall not be a defense to a charge of attempt that because of a misapprehension of the circumstances it would have been impossible for the accused to commit the crime attempted.

(c) Renunciation.

(1) In any prosecution for an attempt to commit a crime, it is a defense that, under circumstances manifesting a voluntary and complete renunciation of his criminal intent, the defendant avoided the commission of the crime attempted by abandoning his criminal effort and, if the mere abandonment was insufficient to accomplish such avoidance, by taking further and affirmative steps which prevented the commission thereof.

(2) A renunciation is not "voluntary and complete" within the meaning of this subsection if it is motivated in whole or part by:

(i) a belief that circumstances exist which increase the probability of detection or apprehension of the defendant or another participant in the criminal enterprise, or which render more difficult the accomplishment of the criminal purpose; or

(ii) a decision to postpone the criminal conduct until another time or to transfer the criminal effort to another victim or another but similar objective.

While this statute was first effective on June 6, 1973, the basic elements of a criminal attempt were long ago set forth by our Supreme Court in *Commonwealth v. Eagen,* 190 Pa. 10, 22–23, 42 A. 374, 377 (1899), when the court described an attempt as:

"an overt act done in pursuant of an intent to do a specific thing; tending to the end but falling short of complete accomplishment of it. In law, the definition must have this further qualification,—that the overt act must be sufficiently proximate to the intended crime

effective since June 6, 1973, and we have discovered no appellate or even lower court decisions interpreting its meaning. A prior statute, from which it was apparently derived, the Act of June 24, 1939, P.L. 872, § 682 (18 P.S. § 4682), differed totally from the present statute in both language and coverage. In the main, it prohibited involvement by public servants in those conflict of interest situations in which they might have dealt, in a public capacity, with entities in which they had a private pecuniary or proprietary interest. An essential element of the crime as set forth in the statute and indictments is the existence of "information which has not been made public", that is, confidential or "inside" information to which the accused has peculiar access by virtue of his public office. Throughout the proceedings below the Commonwealth proceeded on the theory that this "information" consisted of advance knowledge of the fact of admission, i. e., whether or not the Goldenberg boy was admitted to the dental school. R.R. 227a–229a; see also, brief of appellee Lynch at p. 15. Based upon this theory, the lower court held that when and if Lynch acted, this "information" had already been made public, and hence an essential ingredient of § 5302 was missing. More specifically, on the morning of June 29, 1976, Dr. Goldenberg received a call from Dr. Cook "congratulating me that my son got into the school." R.R. 61a. When Biener learned of this, he called Lynch and informed him the boy had been admitted on his own merits and that Dr. Goldenberg was aware of such. The lower court correctly observed the "information" of the admittance was thus public and not the type of confidential or inside information to which the statute is directed. If Lynch indeed attempted

to form one of the natural series of acts which the intent requires for its full execution. So long as the acts are confined to preparation only, and can be abandoned before any transgression of the law or of others' rights, they are within the sphere of intent, and do not amount to attempts."

Our Court has held that an intentional act is an indictable attempt where the act goes so far that it would result, or apparently result, in the actual commission of the crime it was designed to effect, if not extrinsically hindered or frustrated by extraneous circumstances. *Commonwealth v. Kelly,* 162 Pa.Super. 526, 58 A.2d 375 (1948).

to "speculate" on the basis of this "information", the lower court held, there could be no violation of § 5302 since there was no inside information still extant and Lynch was well aware of such after his June 29 conversation with Biener. Opinion of Judge Lavelle at p. 20.

■ On this appeal, the Commonwealth has changed its tactics and now posits that the relevant "information" of § 5302 is not whether or not the boy was admitted, but whether the letter of acceptance had been mailed out to him. Were we to accept this new argument, we would ignore the well-settled rule that appellate courts should not consider theories and issues not posited or advanced in the court below. *Commonwealth v. Hughes,* 480 Pa. 311, 389 A.2d 1081 (1978); *Commonwealth v. Williams,* 476 Pa. 557, 383 A.2d 503 (1978). Since Judge Lavelle did not have the benefit of the Commonwealth's new theory of the relevant "information", and did not rule thereon, we think this Court is precluded from doing so.

Even assuming the claim is properly preserved, we find no merit in it. It makes no difference in this case, for purpose of § 5302, whether the information of the boy's acceptance came through the formal channels of a letter of acceptance or by way of a courtesy telephone call to the father. It was publicly known as of 11:00 a. m. on June 29th. The Goldenbergs knew this, as did Biener, Lynch, and Wojdak. Any action taken by Lynch subsequent to his knowledge, if indeed he did act, was simply not timely to satisfy the "inside information" requirement of § 5302.

### 3) Theft by Deception

■ Lynch was charged with conspiracy to commit theft by deception (18 Pa.C.S.A. §§ 3922 [10], 903) and an attempt to

**10.** § 3922 provides:

(a) Offense defined.—A person is guilty of theft if he intentionally obtains or withholds property of another by deception. A person deceives if he intentionally:

(1) creates or reinforces a false impression, including false impressions as to law, value, intention or other state of mind; but deception as to a person's intention to perform a promise shall not

commit the same (§ 901). The Commonwealth argues that Lynch attempted and conspired to "obtain property" of Dr. Goldenberg by preventing him from receiving formal notice of his son's admission, thus deceiving him into making the payment. We have already shown that the evidence does not suggest *prima facie,* that Lynch intended to receive any benefit from any action he might take to aid Biener in his scheme. He was only aware, so far as the record shows, that Biener wished to receive $10,000. However, this argument has no force under the theft provisions since "obtain" is broadly defined as: "To bring about a transfer or purported transfer of legal interest in property, whether to the obtainer or another." 18 Pa.C.S.A. § 3901. Thus, if Lynch knew that by deceptive action on his part he could bring about a transfer of funds to Biener, the statutory requisites would be satisfied. The Commonwealth's case falls short when it attempts to ascribe to Lynch actual, attempted, or vicarious deceptive action. From Lynch's single statement, "They are going to try and stop the letter." R.R. 90a, the Commonwealth derives the conclusion that Lynch was actively involved, indeed, was the instigator of the attempted delay. If this were in fact the case, then the Commonwealth must come forward with proof sufficient to show, *prima facie,* that Lynch made a substantial step (§ 901) toward that goal and that he shared Biener's criminal objective. Mere knowledge that Biener was engaged in an unlawful operation and mere knowledge that an amorphous "they" are going to try to delay the letter simply does not, without more, so entwine appellee into the scheme as to hold him

be inferred from the fact alone that he did not subsequently perform the promise;

(2) prevents another from acquiring information which would affect his judgment of a transaction; or

(3) fails to correct a false impression which the deceiver previously created or reinforced, or which the deceiver knows to be influencing another to whom he stands in a fiduciary or confidential relationship.

(b) Exception.—The term "deceive" does not, however, include falsity as to matters having no pecuniary significance, or puffing by statements unlikely to deceive ordinary persons in the group addressed.

culpable. While his actions and words undoubtedly raise suspicion, the evidence does not appear in this record to allow us to say he is criminally accountable.

### 4) Theft by Extortion

■ Appellee Lynch was charged with attempt and with conspiracy to commit theft by extortion (18 Pa.C.S.A. § 3923).[11] In *Commonwealth v. Froelich*, 458 Pa. 104, 326 A.2d 364 (1974), the Supreme Court, *inter alia*, analyzed the former extortion statute set forth in the Act of June 24, 1939, P.L. 872, § 318, 18 P.S. § 4318. Although the 1939 Act did not use the word "threatening" as does the present § 3923, the Court in *Froelich* noted that the crime of extortion clearly encompasses a degree of "coercion or intimidation." The word "threatening" in § 3923 embraces the concept that there is no extortion if the elements of coercion or intimidation are missing.

11. § 3923 provides:
(a) Offense defined.—A person is guilty of theft if he intentionally obtains or withholds property of another by *threatening to:*
(1) inflict bodily injury on anyone or commit another criminal offense;
(2) accuse anyone of a criminal offense;
(3) expose any secret tending to subject any person to hatred, contempt or ridicule;
(4) take or withhold action as an official, or cause an official to take or withhold action;
(5) bring about or continue a strike, boycott or other collective unofficial action, if the property is not demanded or received for the benefit of the group in whose interest the actor purports to act;
(6) testify or provide information or withhold testimony or information with respect to the legal claim of another; or
(7) inflict any other harm which would not benefit the actor.
(b) Defenses.—It is a defense to prosecution based on paragraphs (a)(2), (3) or (a)(4) of this section that the property obtained by threat of accusation, exposure, lawsuit or other invocation of official action was honestly claimed as restitution or indemnification for harm done in the circumstances to which such accusation, exposure, lawsuit or other official action relates, or as compensation for property or lawful services.
The Act of June 24, 1976, P.L. 425, No. 102, § 1, effective on that date, amended subsection (1) by deleting the words "inflict bodily injury on anyone or", so that the Act, as amended, now provides in that section only the words: "commit another criminal offense."

In the instant case, we find no evidence no discern any possible inference that Senator Lynch attempted to or conspired with others to engage in threatening, coercive or intimidating conduct. The victim of the alleged attempt to gain money in this case was Dr. Goldenberg. According to the record evidence before us, no facts have been presented to show that he was placed in fear of any particular negative conduct or result if he did not pay money to Mr. Biener. On the contrary, after he sought out Mr. Biener, whom he believed had political influence, Goldenberg was led to believe that his payment of the amount requested might purchase the influence of politicians to assist in the admission of his son to dental school. Later, when Biener was confronted with the news from Dr. Goldenberg that his son had been admitted on his own merits, Biener advised the Doctor that he had confirmed that information and to forget about any payment. We find no evidence of the "threatening" element required by the statute.

## C. Commonwealth v. Wojdak

The Commonwealth's case against appellee Wojdak rested upon a series of four phone conversations with Thomas Elliott and upon Wojdak's relationship with Lynch. These conversations establish: 1) Wojdak was interested in the status of dental school applicant Goldenberg, (first, second, and third conversations, R.R. 109a–111a); 2) when apprised of Goldenberg's admission, he wished to know if the acceptance letter could be delayed for a day, (third conversation, R.R. 111a); 3) when he learned the letter had already gone out, he exclaimed, "They are trying to go around me" (fourth conversation, R.R. 112a). From this meager record, the Commonwealth urges that Wojdak is implicated in a subtle and complex scheme of bribery, improper use of office, conspiracy, deceit, and theft. We do not agree with these conclusions since they are premised on conjecture and suspicion and not on facts of record.

In the court below, the Commonwealth conceded Wojdak was not involved in the "scheme" prior to June 30,

1976. They further conceded it could not be directly shown that appellee ever spoke with Lynch concerning this incident, or that he agreed to accept any part of the money, or that he knew Samuel Biener. It seems apparent that if Wojdak had phoned Elliott with his request as to the status of the boy's application, without any connection to Lynch or Biener, there would be no allegation of a criminal act. Indeed, it was demonstrated below that legislators are frequently given advance notice of an applicant's admission so that they may be the first to carry the "good news" to the applicant or his family. R.R. 117a–118a. But the Commonwealth attempts to transform Wojdak's conduct, innocent on its face, into a crime by imputing to him all the alleged knowledge and alleged criminal intent of Lynch and Biener, this despite the uncontroverted facts that there is no proof Wojdak ever spoke with Lynch concerning this incident, or that he knew Biener, or that he was aware of Biener's dealings with Dr. Goldenberg and Lynch. Nor is there a showing that Wojdak's request that the letter be delayed, again a seemingly innocent request, was the result of an agreement with Lynch. The Bribery count against Wojdak must then fall since the record is devoid of facts demonstrating that he ever agreed to accept a pecuniary benefit in return for any act of his. Indeed, the Commonwealth concedes that it could not show such. The Speculating charge was also not proven *prima facie* since the Commonwealth could not prove that Wojdak wished to delay the letter for the purpose of "speculating or wagering" or for acquiring a "pecuniary interest" in the fact of the boy's admission. 18 Pa.C.S.A. § 5302(1)(2). Mr. Elliott, who knew best the nature and purpose of these calls, saw no criminal overtones in appellee's request for he, in turn, addressed the same inquiry to the university admissions officer. As Wojdak's conduct is adequately explained in this manner, and the record is barren of proof of any other intent, there is simply no evidence to support the charge. The count of theft by deception is similarly deficient for there is no record proof that Wojdak had knowledge of any property or money

promised to anyone concerning the Goldenberg application. Hence, even conceding he wished to "deceive" Dr. Goldenberg for a day or so as to the formal notice of his son's admission, the attempted theft charge must fail, absent proof that Wojdak was aware of the $10,000 figure being verbally passed around. Finally, the charges as to theft by extortion must be dismissed since there is no proof that Wojdak threatened, intimidated, or coerced Dr. Goldenberg into parting with his money or that Wojdak attempted or conspired to do the same. Indeed, we may glean from the record that Wojdak did not even know Dr. Goldenberg.

■ The Commonwealth's theory that Wojdak may be vicariously liable for the acts of Lynch must also fail since we have already shown there is no proof of conspiracy, i. e., shared criminal intent, between the two.

As the lower court concluded: "The evidence produced by the Commonwealth completely fails to establish that Wojdak participated as principal, co-conspirator, or as accomplice in a violation of the sections of the Crimes Code. There is no transactional connection shown between him and Lynch, between him and Biener, or between him and Dr. Goldenberg, or that he had any inkling of what might have transpired between and among them. In the absence of evidence that Wojdak had some knowledge of whatever went on between and among that trio, there is no criminal purpose to be found in anything Wojdak said to Elliott. The Commonwealth cannot sidestep its burden of showing that Wojdak's telephone call on the morning of June 30th played some part in the criminal scheme to relieve Dr. Goldenberg of fifteen thousand dollars by asking *why else* would Wojdak make such a call. This type of speculation is no substitute for evidence." Opinion at p. 21–2.

■ To summarize: The question for determination by this Court, following a review of the record from the court below, is to determine whether the evidence received at the

preliminary hearing presented sufficient probable cause to believe that the appellees committed the offenses for which they are charged. The quantity and quality of evidence presented there "should be such that if presented at trial in court, and accepted as true, the judge would be warranted in allowing the case to go to the jury." *Commonwealth ex rel. Scolio v. Hess*, 149 Pa.Super. 371, 27 A.2d 705 (1942). The Commonwealth's burden at a preliminary hearing is to establish at least prima facie that a crime has been committed and that the accused is the one who committed it. *Commonwealth v. Mullen*, 460 Pa. 336, 333 A.2d 755 (1975). This means that at a preliminary hearing, the Commonwealth must show the presence of every element necessary to constitute each offense charged and the defendant's complicity in each offense. Proof beyond a reasonable doubt is not required, nor is the criterion to show that proof beyond a reasonable doubt is possible if the matter is returned for trial. However, proof, which would justify a trial judge submitting the case to the jury at the trial of the case, is required. Inferences reasonably drawn from the evidence of record which would support a verdict of guilty are to be given effect, *Commonwealth v. Rodgers*, 235 Pa.Super. 106, 340 A.2d 550 (1975), and the evidence must be read in the light most favorable to the Commonwealth's case. *Commonwealth v. Zeringo*, 214 Pa.Super. 300, 257 A.2d 692 (1969). Prosecutorial suspicion and conjecture are not evidence and are unacceptable as evidence.

Our function is to take the facts proven by the Commonwealth at the preliminary hearing and to determine whether the sum of those facts fits within the statutory definition of the types of conduct declared by the Pennsylvania legislature in the Crimes Code to be illegal conduct. If the proven facts fit the definition of the offenses with which the appellees are charged, then a prima facie case was made out as to such offense or offenses. If the facts do not fit the statutory definitions of the offenses charged against the appellees, then the appellees are entitled to be discharged.

*Commonwealth ex rel. Levine v. Fair*, 394 Pa. 262, 146 A.2d 834 (1959); *Commonwealth ex rel. Scolio v. Hess*, supra; *Commonwealth v. Milletich*, 29 Bucks Co.L.Rep. 142 (1976); *Commonwealth v. Morton*, 25 D. & C.2d 699 (1961); cf. *Commonwealth v. Hetherington*, 460 Pa. 17, 331 A.2d 205 (1975).

Our review of the record of the habeas corpus hearings and the opinion of the court below leads us to conclude that the Commonwealth failed to produce sufficient evidence to establish a prima facie case on the charges against the appellees.

In view of the foregoing, we need not rule on the Commonwealth's petitions for extensions of time to commence trial pursuant to Rule 1100(c).

The orders of the habeas court discharging the appellees are affirmed.

VAN der VOORT, J., concurs in the result.

MONTGOMERY, J., files a concurring and dissenting statement.

MONTGOMERY, Judge, concurring and dissenting:

I agree with the conclusion reached by the Majority with respect to the affirmance of the lower court's discharge of the Appellees on the charges of attempted theft by extortion and conspiracy to commit theft by extortion. However, I must respectfully dissent as to the affirmance of the action of the habeas corpus court on the remaining charges outstanding against the Appellees. In my view, the record sets forth facts which are clearly sufficient to establish a prima facie case, sufficient for trial, on each remaining charge against the Appellees. Thus, I would reverse the habeas corpus court and reinstate all charges against each Appellee except those involving attempted theft by extortion and conspiracy to commit theft by extortion.